**In the United States District Court**
**for the District of Maryland**
Greenbelt Division

| | |
|---|---|
| **United States of America,** *ex rel.* **Anonymous** | **Case No. _____** |
| | |
|           **Plaintiff,** | **Complaint for Violations of the False Claims Act, 31 U.S.C. §§ 3729,** *et seq.* |
| **v.** | **Filed Under Seal** |
| **Anonymous,** | **Jury Trial Demanded** |
|           **Defendants.** | |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
Greenbelt Division

| | |
|---|---|
| **United States of America,** *ex rel.* **Sherette Rhodes,**<br>13900 Churchville Drive<br>Upper Marlboro, MD 20772<br><br>and<br><br>*ex rel.* **Alisa Mosley**<br>5208 Stream Bank Ln.<br>Greenbelt, MD 20770<br><br>        **Plaintiffs,**<br><br>v.<br><br>**Capital Technology Information Services, Inc.,**<br>One Research Court<br>Suite 200<br>Rockville, MD 20850<br><br>**Kweisi Mfume,**<br>One Research Court<br>Suite 200<br>Rockville, MD 20850<br><br>**John Ruffin,**<br>14670 Senaca Road<br>Darnestown, MD 20874<br><br>and<br><br>**Crystal Reed,**<br>One Research Court<br>Suite 200<br>Rockville, MD 20850<br><br>        **Defendants**. | Case No. _____<br><br>**Complaint for Violations of the False Claims Act, 31 U.S.C. §§ 3729,** *et seq.*<br><br>**FILED UNDER SEAL**<br><br>**JURY TRIAL DEMANDED** |

## INTRODUCTION

1.      *Qui tam* relators Sherette Rhodes and Alisa Mosley by and through their attorneys, on behalf of the United States of America, file this complaint against Capital Technology Information Services, Inc. (CTIS), Kweisi Mfume, and John Ruffin to recover damages, penalties, and attorneys' fees for violations of the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.* committed by the Defendants.

2.      On or about July 1, 2013, the National Institute of Minority Health and Health Disparities (NIMHD) of the National Institutes of Health (NIH) awarded CTIS a $15 million grant over a period of five years to create, fund, and operate the Health Policy Research Consortium (HPRC).

3.      Between Fiscal Years 2013 and 2016, CTIS received $10.5 million from NIMHD for HPRC of which virtually none of the grant was spent on legitimate research projects.

4.      The terms of the HPRC grant require that CTIS spend grant funds on research carried out by the members of the HPRC, but instead, the NIMHD grant has primarily benefited CTIS and its politically-connected leaders and consultants.

5.      CTIS is engaged in an ongoing scheme to defraud the U.S. Government and violate 31 U.S.C. § 3729(a)(1)(A)-(B) by:

   a)  Violating the terms and conditions of the NIMHD grant by taking U.S. Government funds intended for furtherance of a government purpose and failing to provide deliverables as required by the grant;

   b)  Violating the terms and conditions of the NIMHD grant by taking U.S. Government funds and using the HPRC grant funds to pay salaries and wages,

fringe benefits, and personnel costs for CTIS personnel and consultants who are
producing little to no HPRC work and non-HPRC work for CTIS;

c)  Violating the terms and conditions of the NIMHD grant by taking U.S.
Government funds and using the HPRC grant funds to pay for unapproved, failed,
and incomplete projects; and

d)  Violating the terms and conditions of the NIMHD grant by taking U.S.
Government funds and using the HPRC grant funds to pay for expenses outside
the scope of the grant; and

6.     By submitting false claims in support of grant awards from the U.S. Government,
Defendants have violated the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

7.     By submitting false documents in support of its claims for payment of grant funds
to the U.S. Government, Defendants have violated the False Claims Act, 31 U.S.C. §
3729(a)(1)(B).

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331
and 31 U.S.C. § 3732(a).

9.     This Court has personal jurisdiction over Defendant CTIS pursuant to 31 U.S.C. §
3732(a) because CTIS maintains an office and transacts business in this judicial district.

10.     This Court has personal jurisdiction over Defendant Kweisi Mfume pursuant to
31 U.S.C. § 3732(a) because Mfume can be found and transacts business in this judicial district.

11.     This Court has personal jurisdiction over Defendant John Ruffin pursuant to 31
U.S.C. § 3732(a) because Ruffin can be found and transacts business in this judicial district.

12.    Venue is proper in this Court under 28 U.S.C. §§ 1391(c) and 1395(a), and 31 U.S.C. § 3732(a), because the principal defendant, CTIS, maintains an office in this judicial district, the relevant contract was executed in this judicial district, most witnesses reside or can be found in this judicial district, the U.S. Government funds at issue originated from an agency headquartered in this district, and a substantial portion of the activities that form the basis of the complaint were planned and directed in this judicial district.

## PARTIES

### Relator Sherette Rhodes

13.    Rhodes was a juvenile correction officer for 20 years. She has an undergraduate degree in organizational management, and a Master's degree in public administration. She is currently seeking a PhD in public policy and social change.

14.    Rhodes learned of HPRC opportunities through a classmate in her PhD program. She interviewed for the position of Deputy Director of Health and Human Services, but CTIS was not hiring for that position. After two interviews, CTIS hired Rhodes as the HPRC Deputy Director of Policy, Education, and Training. Rhodes started May 18, 2015.

### Relator Alisa Mosley

15.    Relator Alisa Mosley was the HPRC Deputy Program Director. Mosley has been with CTIS since the second half of the first year of the five-year HPRC grant. Mosley was tasked with managing the day-to-day operations and working with the HPRC Program Director on Scientific Research.

16.    Mosley has a Bachelor of Arts degree in Communications and a Master's degree in Communications. Mosley spent nearly 10 years at the National Medical Association and

nearly three years at the George Washington University Medical Faculty Associates as a Clinical Practice Manager.

**Defendant CTIS**

17.    CTIS, a for-profit health informatics company, contracts to provide health analytics and website infrastructure work for U.S. Government organizations.

18.    The particular grant that is the subject of this complaint led to the creation of the HPRC. HPRC, which CTIS oversees, is supported by NIMHD, a NIH institute, under Federal Award Identification Number U54MD008608.

**Defendant Kweisi Mfume**

19.    Kweisi Mfume serves as Principal Investigator of HPRC.

20.    Mfume also serves as a member on CTIS's Board of Director, as CTIS's Chief Health Equity Officer, and Chairman of the Board of Directors for Morgan State University.

21.    Morgan State University is an organizational member of HPRC and received funding from HPRC.

22.    Mfume also served as a five-term member of Congress from Maryland's 7th Congressional District, as president and chief executive officer of the National Association for the Advancement of Colored People, on the Baltimore City Council for seven years, as executive director of the National Medical Association, and as a member of the NIMHD Advisory Council.

**Defendant John Ruffin**

23.    John Ruffin was the founding director of NIMHD, which the Affordable Care Act created in 2010, and retired from NIH in March 2014 after 24 years of service at the agency.

24.     Ruffin was a CTIS consultant and served as HPRC's Chief Engagement Officer, invoicing his services to the HPRC grant.

**Defendant Crystal Reed**

25.     Crystal Reed is HPRC's Program Director.

26.     As HPRC's Program Director, Reed is supposed to guide the work under the grant, speak with deputy directors, and assign duties.

27.     Reed is also supposed to approve the work done by deputies, including training reviews.

28.     CTIS's offices are located at 6401 Golden Triangle Drive, Suite #310, Greenbelt, MD 20770. The communities ostensibly served by the grant are in Prince George's County, Maryland.

## FACTUAL ALLEGATIONS

**Background and Purpose of the HPRC Grant**

29.     Based in Rockville, Maryland, CTIS has been helping organizations capture, store, and use health and biomedical science information for 25 years.

30.     CTIS receives grant funding from the National Institutes of Health (NIH).

31.     Since Fiscal Year 2006, CTIS has received nearly $108 million from NIH.

32.     NIH is a large federal agency within the U.S. Department of Health and Human Services.

33.     NIH's Fiscal Year 2016 budget was $31.3 billion.

34.     NIH's budget supports the agency's 27 institutes and centers, including the National Institute of Minority Health and Health Disparities (NIMHD).

35.    NIH's institutes and centers award contracts and grants to scientists, research institutions, and other organizations to support research activities that align with their respective mission and the overall mission of NIH.

36.    "NIH's mission is to seek fundamental knowledge about the nature and behavior of living systems and the application of that knowledge to enhance health, lengthen life, and reduce illness and disability."

37.    "NIMHD's mission is to lead scientific research to improve minority health and reduce health disparities."

38.    NIMHD put out a Funding Opportunity Announcement, number RFA-MD-13-003, to support the establishment of "specialized Transdisciplinary Collaborative Centers (TCCs) for Health Disparities Research comprising regional coalitions of academic institutions, community organizations, service providers and systems, government agencies and other stakeholders focused on priority research areas in minority health and health disparities."

39.    According to RFA-MD-13-003, the "initiative is intended to support coordinated research, implementation and dissemination activities that transcend customary approaches and 'silo' organizational structures to address critical questions at multiple levels in innovative ways."

40.    According to RFA-MD-13-003, "[t]he purpose . . . is to support the development of TCCs focused specifically on health policy research."

**EXHIBIT A**

RFA-MD-13-003: NIMHD Transdisciplinary Collaborative Centers for Health Disparities Research [U54]

# Department of Health and Human Services

# Part 1. Overview Information

| | |
|---|---|
| **Participating Organization(s)** | National Institutes of Health (NIH) |
| **Components of Participating Organizations** | National Institute on Minority Health and Health Disparities (NIMHD) |
| **Funding Opportunity Title** | **NIMHD Transdisciplinary Collaborative Centers for Health Disparities Research [U54]** |
| **Activity Code** | U54 Specialized Center- Cooperative Agreements |
| **Announcement Type** | Reissue of RFA-MD-12-007 |
| **Related Notices** | • December 12, 2012 - See Notice NOT-MD-13-004, Notice of Correction of Research Plan Instructions, |
| **Funding Opportunity Announcement (FOA) Number** | **RFA-MD-13-003** |
| **Companion Funding Opportunity** | None |
| **Number of Applications** | Only one application per institution is allowed, as defined in Section III. 3. Additional Information on Eligibility. |
| **Catalog of Federal Domestic Assistance (CFDA) Number(s)** | 93.307 |
| **Funding Opportunity Purpose** | The National Institute on Minority Health and Health Disparities (NIMHD) seeks to establish specialized Transdisciplinary Collaborative Centers (TCCs) for Health Disparities Research comprising regional coalitions of academic institutions, community organizations, service providers and systems, government agencies and other stakeholders focused on priority research areas in minority health and health disparities, This initiative is intended to support coordinated research, implementation and dissemination activities that transcend customary approaches and "silo" organizational structures to address critical questions at multiple levels in innovative ways, The purpose of this funding opportunity is to support the development of TCCs focused specifically on health policy research. |

41.    CTIS submitted a grant application in response to RFA-MD-13-003 to create, operate, and fund the HPRC, which NIMHD approved for funding.

42.    Altogether, NIMHD awarded CTIS a $15 million grant over a five-year period—from 2013 to 2017—for HPRC.

43.    Between Fiscal Years 2013 and 2016, CTIS received $10.5 million from NIMHD for HPRC of which very little was spent on legitimate research projects.

44.    The defendants have been violating the terms and conditions of the NIMHD grant.

**False Claim I: Failure to Provide Deliverables with HPRC Grant Funds**

45.    According to RFA-MD-13-003, "TCCs . . . **must** include a one-year planning phase and a four-year program implementation phase." [emphasis added]

46.    According to RFA-MD-13-003, "[t]he goal of the planning phase is to:

a)  solidify collaborative relationships with all partners for a regional organizational structure that will support research, implementation and dissemination activities;

b)  fully assess existing research and outreach/dissemination capacity for the proposed activities, including scientific and administrative resources and needs;

c)  identify and engage additional partners needed to fill identified gaps;

d)  finalize procedures for soliciting, selecting and overseeing pilot research projects and identify initial projects to be supported, and

e)  develop a detailed plan for executing the program implementation phase."

47.    Despite the grant terms and conditions, CTIS has not completed any scientific studies with HPRC grant funds.

48.    During a July 2015 meeting, Derrick Tabor from NIMHD counseled Mfume, Mosley, and Reed that CTIS needed to be going down a more scientific route and supporting peer-reviewed research.

49.    In September 2015, during a call between Tabor and CTIS, they discussed the study design methodology and ultimate strategy for cardiovascular health and health policy literacy studies called "Disadvantage in the Food, Built, and Social Environments: A Study of Cardiovascular Health" and "The Health Policy Literacy Study: Bridging the Gap between Community, Science and Policy."

50.    Despite the September 2015 agreement between Tabor and CTIS, Mfume explicitly refused to allow the HPRC Program Director and the HPRC Deputy Program Director to follow through with the cardiovascular health and health policy literacy studies.

51.    CTIS has not produced any scientific research or papers published in peer-reviewed scientific journals with HPRC grant funds.

52.    The few papers CTIS has produced with HPRC grant funds were simply reviews of existing literature that were not published in peer-reviewed scientific journals.

53.    Although available on HPRC's website, all but one or two of the "review" papers CTIS produced with the HPRC grant funds simply sat in boxes at CTIS's office and were never disseminated.

54.    CTIS had approximately 500 copies of the "review" papers produced with HPRC grant funds printed as high gloss, color booklets.

55.    Despite having handled the grant since 2013 and spending $3 million per year on the grant, the background information available through NIH's grant database demonstrates that HPRC has not produced any results.

**EXHIBIT B**



56.     Mfume used his numerous roles and influence to steer some HPRC grant funding to Morgan State University where Mfume is Chairman of the Board of Directors.

57.     All HPRC member organizations—including Morgan State University—received $100,000 for joining the HPRC

58.     Morgan State University is set to receive another $100,000 from the HPRC grant to support "The Health Policy Literacy Study: Bridging the Gap between Community, Science and Policy."

**False Claim II: CTIS Cashing in on the HPRC Grant**

### A.   John Ruffin Received HPRC Grant Funds for Little to No Work

59.     The HPRC grant has primarily benefited CTIS and its politically-connected leaders and consultants, including Kweisi Mfume and John Ruffin.

60.     On July 2, 2015, Rhodes attended a meeting when Ruffin was introduced as the new HPRC Chief Engagement Officer.

61.     At the July 2, 2015, meeting, Mfume told Rhodes and other CTIS personnel in attendance something to the effect that Ruffin would be the link to federal entities.

62.     Ruffin is also listed on some CTIS billing documents as a contracted policy researcher.

63.     Only Mfume and Reed were allowed to communicate directly with Ruffin, who only physically visited CTIS's office twice in the time that the Relators worked at CTIS.

64.     Ruffin usually faxed his invoices and weekly time records. These records consistently say "Worked with HPRC on NIH Grant and other operations as agreed," and nothing else.

65.    Mosley questioned Reed about Ruffin not providing deliverables in support of the invoices he was submitting.

66.    Mosley suggested to Reed that CTIS ask Ruffin for deliverables in support of his invoice submissions.

67.    In response to Mosley's inquiry, Reed said something to the effect that Ruffin did no work and indicated that she spoke to Mfume about implementing more accountability for Ruffin, but that Mfume became upset and shut down the conversation.

68.    Although he produced no deliverables, Ruffin invoiced CTIS for $9,161.80 monthly for HPRC work that was billed to the HPRC grant.

**EXHIBIT C**





69.    Sometime in or around July 2016, Ruffin was removed from his role with CTIS, having never produced any work product or connected CTIS personnel and HPRC members to federal resources.

### B.  Non-HPRC Work Billed to the HPRC Grant

70.    In April or May 2014, CTIS hired Willarda Edwards as a Medical Officer Consultant for HPRC.

71.    Edwards worked part-time with limited responsibility.

72.     Edwards produced some papers—none that were published in peer-reviewed scientific journals—under the supervision of HPRC Senior Writers.

73.     Although Edwards's work required significant editing and even rewriting, Edwards was paid approximately $119 per hour from HPRC grant funds.

74.     In September 2015, Rhodes noticed that Mfume and Reed were conducting non-HPRC work for CTIS that was billed to the HPRC grant.

75.     In July 2016, CTIS Chief Executive Officer Rajesh Shah announced via an office memorandum that Mfume, the Principal Investigator of HPRC, would thereafter be a member of The Business Initiatives Division of CTIS, as well as a member of the Core Decision Team, and a Board Member of CTIS.

76.     After the changes announced in Shah's July 2016 office memorandum, HPRC grant funds were used to pay 100 percent of the HPRC leaders' time—including Mfume's—even though HPRC's leaders were not spending 100 percent of their time on HPRC work.

77.     The non-HPRC work billed to the HPRC grant violates the NIMHD award agreement.

78.     In addition to her HPRC work, Reed is also Senior Director of CTIS's newly-created Public Health and Research Group.

79.     Reed billed 100 percent of her time to the HPRC grant even though she regularly worked on non-HPRC presentations and other work for CTIS.

80.     On July 19, 2016, CTIS distributed a new organizational chart outlining the changes to its new "functional" group.

81.     CTIS's new July 19, 2016, organizational chart showed Mfume on the CTIS Board of Directors and as the Chief Health Equity Officer for CTIS.

82.     Mfume continues to serve on the CTIS Board of Directors and as the Chief Health Equity Officer for CTIS despite billing 100 percent of his time to the HPRC grant "ostensibly" in his capacity as HPRC's Principal Investigator.

83.     In July 2016, an employee named Kendra Tappin tendered her resignation from CTIS.

84.     Tappin did not return to work in the office after July 2016 except to pick up her computer.

85.     Tappin continued to receive her full salary and wages after her July 2016 resignation.

86.     Reed told Rhodes something to the effect that Mfume no longer wanted Tappin in the office because Mfume was afraid that Tappin would file a lawsuit against him.

87.     In a November 2016 staff meeting, Reed told Rhodes and other HPRC personnel something to the effect that they should concentrate more on how to grow the grant side of CTIS's Public Health and Research Group.

88.     Reed told Rhodes and Mosley that too many CTIS administrative staff were billing to the grant.

89.     On January 19, 2017, John Sankofa, CTIS's Senior Health Writer, was working on a MERCK grant application for CTIS that was billed to the HPRC grant.

90.     HPRC billing documents reveal that many CTIS personnel had false or misleading titles. For example:

    a)   Ruffin was billed as a "Policy Researcher," even though his title was actually the HPRC Chief Engagement Officer;

b) Raj Shah was billed as a "Director," even though he is the CTIS Chairman and Chief Executive Officer; and

c) Willarda Edwards was billed as a "Health Info Analyst," even though she actually worked as the HPRC Consulting Medical Officer.

## EXHIBIT D



**C. CTIS Steering Committee Members Paid from HPRC Grant Funds**

91.    CTIS pays three HPRC Steering Committee members, Vivian Pinn, Elmer

Huerta, and Thomas LaVeist, $1,000 every month from HPRC grant funds.

92.    Pinn, Huerta, and LaVeist participated in only one HPRC Steering Committee

meeting in October 2015.

93.    Pinn, Huerta, and LaVeist agreed to be interviewed for a HPRC YouTube Health

Disparities Series.

94.    Other than participating in the October 2015 HPRC Steering Committee meeting

and HPRC YouTube Health Disparities Series interviews, Pinn, Huerta, and LaVeist contributed

nothing else to HPRC in exchange for their monthly $1,000 payments from HPRC grant funds.

**False Claim III: HPRC Funds Spent on Unapproved, Failed, and Incomplete Projects**

**A. HPRC Community Mapping and Photo-Voice Project**

95.    After her arrival at HPRC in May 2015, one of Rhodes's first assignments was to

look at the strength of a HPRC Community Mapping and Photo-Voice Project that recruited

residents of low-income areas in Prince George's County, Maryland, to take photos of their

communities.

96.    The HPRC Community Mapping and Photo-Voice Project was supposed to

provide a look at the communities in which people lived and the impact of various policies on

those communities.

97.    The HPRC Community Mapping and Photo-Voice Project objectives included

development of a book featuring reports of public health issues accompanied by pictures of

messy streets, poor living conditions, and other degenerative and faulty conditions in the

communities, as well as health policy recommendations.

98.    CTIS gave the HPRC Community Mapping and Photo-Voice Project participants iPads to take photos of their communities for the project that CTIS allowed the HPRC Community Mapping and Photo-Voice Project participants to keep.

99.    Altogether, the HPRC Community Mapping and Photo-Voice Project iPads cost approximately $20,000, which were paid from HPRC grant funds.

100.    Although a few pictures were collected and shared with HPRC from the HPRC Community Mapping and Photo-Voice Project, a HPRC Community Mapping and Photo-Voice Project book was never produced or published.

101.    The HPRC Community Mapping and Photo-Voice Project book was supposed to include findings from a health policy literacy survey conducted during another CTIS study.

102.    The health policy literacy survey was never assigned to a HPRC member organization to conduct or create in the time that the Relators worked at CTIS.

103.    Rhodes expressed serious reservations about the structure and purpose of the HPRC Community Mapping and Photo-Voice Project, concluding that the HPRC Community Mapping and Photo-Voice Project would likely fail.

104.    Despite Rhodes's reservations about the HPRC Community Mapping and Photo-Voice Project, HPRC moved forward with the HPRC Community Mapping and Photo-Voice Project.

105.    As Rhodes had predicted, the HPRC Community Mapping and Photo-Voice Project failed in achieving its purpose.

106.    The HPRC Community Mapping and Photo-Voice Project never received required approval from NIMHD.

107.    CTIS wants to keep the failed HPRC Community Mapping and Photo-Voice Project a secret.

108.    No one at CTIS is allowed to talk about HPRC Community Mapping and Photo-Voice Project

### B.  HPRC EASE Tool Database, Mobile App, and Web-Based Policy Portal

109.    In March 2014, CTIS commissioned the development of a HPRC database it called the "EASE Tool Database" to maintain contacts and clinical data and manage meeting registrations.

110.    The 2014 award notification for the HPRC grant to CTIS specifically asserts "RESTRICTION: No foreign components have been approved."

111.    Development of the EASE Tool Database was contracted to an Indian developer in direct contravention of the NIH grant's prohibition on foreign components.

112.    CTIS abandoned the EASE Tool Database project during the early stages of development because the database was too cumbersome and difficult to use.

113.    The EASE Tool Database project cost approximately $200,000 to $250,000, which was paid from HPRC grant funds.

114.    In 2014, CTIS began developing a HPRC-funded mobile app that would help users find places to engage in healthy activity such as hiking trails and parks.

115.    CTIS hired at least five fulltime developers to develop the HPRC Mobile App.

116.    The HPRC Mobile App developers made little progress on the app before they were terminated by Mfume.

117.    The HPRC Mobile App project remained abandoned until about October 2016 when HPRC decided to try again with a single developer who completed the project in the course of a few months.

118.    In its NIMHD grant application for the HPRC, CTIS proposed creating a "policy portal" that would be a web-based tool for the public to search for policies impacting health.

119.    CTIS did not even begin development of the HPRC Web-Based Policy Portal until the fall of 2016.

120.    Development of the HPRC Web-Based Policy Portal should have begun earlier with updates throughout the life of the grant.

121.    The estimated cost of the HPRC Web-Based Policy Portal is $100,000 to $150,000.

**C.  HPRC YouTube Series and Radio Show**

122.    In or around June 2016, HPRC began taping a YouTube Health Disparities Series at a studio in Baltimore, Maryland, paid from HPRC grant funds.

123.    Mosley, Reed, and Sankofa went to the Baltimore studio for a HPRC YouTube Health Disparities Series taping of experts interviewed about various topics.

124.    Rhodes attended a HPRC YouTube Health Disparities Series taping at the Baltimore studio and added it to her status report for the period ending August 15, 2016.

**EXHIBIT E**

> the last few slides and have it ready for release.7/20
> •  Traveled to Baltimore for the You Tube Series taping. The guests for this studio taping was Thomas A. LaVeist, PhD, Vinny Demarco, and Dr. Leana Wen the Baltimore Health commissioner. Discussed how the product will be disseminated, also discussed their actual research interests and their areas of interest and what they are doing now.8/1

125.    The HPRC YouTube Health Disparities Series interviews were supposed to be posted on a YouTube channel for public viewing.

126.    As of the date of this complaint filing, HPRC has spent approximately $75,000 on the HPRC YouTube Health Disparities Series, which is still in production.

127.    In addition to the HPRC YouTube Health Disparities Series, CTIS commissioned the recording of a radio show called "Make the Change" that broadcast on 1450AM, which was paid from HPRC grant funds.

128.    Failing to see their scientific value, Mosley suggested that Reed consult with NIMHD to get the HPRC Make the Change Radio Program and the HPRC YouTube Health Disparities Series approved.

129.    Reed never obtained approval from NIMHD for the HPRC Make the Change Radio Program and the HPRC YouTube Health Disparities Series.

**False Claim IV: HPRC Funds Spent on Expenses Outside the Grant's Scope**

130.    With funds from the HPRC grant, CTIS moved into office space at 6401 Golden Triangle Drive, Suite #310, Greenbelt, Maryland 20770.

131.    With funds from the HPRC grant, CTIS transformed the organization's back office space into 12 cubicles in August 2015 at a cost of thousands of dollars.

132.    Only five people occupied the new CTIS cubicles.

133.    Mfume was not satisfied and wanted the cubicles torn down not long after they were installed in order to put up shorter walls.

134.    With funds from the HPRC grant, CTIS spent several thousand dollars in September 2015 to purchase two flat screen TVs and a Smart Board.

135.    No one at CTIS uses the office Smart Board or TVs.

**CTIS Terminated Both Relators**

136.    CTIS terminated Rhodes and Mosley on January 19, 2017.

137.    CTIS claimed it terminated Rhodes and Mosley because the organization was "going in a more scientific direction."

138.    The HPRC grant was intended to conduct scientific research from the outset, an approach both Rhodes and Mosley were well-equipped to handle and advocated for.

**The Defendants' Fraud Has Cost the U.S. Government Millions of Dollars**

139.    Since Fiscal Year 2006, CTIS has received nearly $108 million in total grant awards from NIH.

140.    The NIMHD grant award for HPRC was for $15 million over a five-year period of which CTIS has received $10.5 through Fiscal Year 2016.

141.    Given that CTIS has not yet completed any studies or projects, not published any papers in peer-reviewed scientific journals, billed non-HPRC work to HPRC grant funds, and spent HPRC grant funds on expenses outside the scope of the HPRC grant, CTIS's entire expenditure of the HPRC grant to this point represents damage to the U.S. Government.

**COUNT I**
**Violations of the Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A)**

142.    Relators reassert and incorporate by reference all paragraphs set forth above as if restated therein.

143.    Defendants CTIS, Kweisi Mfume, and John Ruffin violated the federal False Claim Act by knowingly presenting false or fraudulent claims for payment or approval to an agency of the U.S. Government.

144.    As set forth more fully above, these Defendants, acting with knowledge falsely certified compliance with the terms and conditions of the NIMHD grant by:

    a.    Failing to provide deliverables in accordance with the NIMHD grant award to CTIS for HPRC;

    b.    Using the NIMHD grant award to CTIS for HPRC to pay salaries and wages, fringe benefits, and personnel costs for CTIS personnel and consultants who are producing little to no HPRC work and non-HPRC work for CTIS;

    c.    Spending millions from the NIMHD grant award to CTIS for HPRC on unapproved, failed, and incomplete projects such as the HPRC Community Mapping and Photo-Voice Project that gave away iPads that cost $20,000 to participants while producing nothing of value; and

    d.    Spending the NIMHD grant award on expenses outside the scope of the HPRC grant given to CTIS, including CTIS's office move, cubicle installation, TVs, and smart board.

145.    Defendants' false statements were material to NIMHD's decision to grant funds to CTIS.

146.    The U.S. Government has been damaged as a result of these Defendants' conduct by paying money for work never performed; services never provided; unapproved, failed, and incomplete deliverables; and expenses outside the scope of the NIMHD grant award to CTIS for HPRC.

## COUNT II
### Violation of the Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(B)

147.    Relators reassert and incorporate by reference all paragraphs set forth above as if restated therein.

148.    Defendants CTIS, Kweisi Mfume, and John Ruffin violated the federal False Claim Act by knowingly making or using, or causing to be made or used, false records or statements that were material to false or fraudulent claims.

149.    Specifically, CTIS, Kweisi Mfume, and John Ruffin acting with knowledge:

a.    Falsely certified compliance with the terms of the grant when providing billing documents to NIMHD;

b.    Produced billing invoices for John Ruffin describing services Ruffin did not perform;

c.    Billed NIMHD grant funds using time records that misrepresented which employees worked on HPRC projects, instead including many employees who worked as part of the CTIS administrative apparatus; and

d.    Billed NIH grant funds using time records that misrepresented the work and titles of numerous staff and consultants.

150.    Defendants' false records were material to NIMHD's decision to grant funds to CTIS.

151.    The U.S. Government has been damaged as a result of these Defendants' conduct by paying money for work never performed; services never provided; unapproved, failed, and incomplete deliverables; and expenses outside the scope of the NIMHD grant award to CTIS for HPRC.

**COUNT III**
**Violation of the Federal False Claims Act, 31 U.S.C. § 3730(h)**

152.    Relators reassert and incorporate by reference all paragraphs set forth above as if restated therein.

153.    Rhodes is an "employee" and CTIS is an "employer" as the terms are defined by the federal False Claims Act.

154.    Rhodes engaged in protected activity when she challenged the study design and lack of approval of the HPRC Community Mapping and Photo-Voice Project, and raised concerns to HPRC Program Director Crystal Reed that the grant was not producing any scientific research per the government purpose of the grant. In raising concerns about CTIS compliance with the terms of the grant, Rhodes reasonably believed she challenged an unlawful billing practice. Defendants responded to Rhodes's actions by terminating her employment.

155.    To redress the harms she has suffered as a result of the acts and conduct by Defendants in violation of 31 U.S.C. § 3730(h), Rhodes is entitled to damages including two times the amount of back pay, interest on back pay, and any other damages available by law, including litigation costs and reasonable attorneys' fees.

### COUNT IV
### Violation of the Federal False Claims Act, 31 U.S.C. § 3730(h)

156.    Relators reassert and incorporate by reference all paragraphs set forth above as if restated therein.

157.    Mosley is an "employee" and CTIS is an "employer" as the terms are defined by the federal False Claims Act.

158.    Mosley engaged in protected activity when she suggested to Program Director Crystal Reed that many of the projects funded by HPRC were not scientific, and should not be funded by HPRC funds. In suggesting that Reed obtain approval for these projects from NIH, Mosley reasonably believed she challenged an unlawful billing practice. Defendants responded to Mosley's actions by terminating her employment.

159.    To redress the harms she has suffered as a result of the acts and conduct by Defendants in violation of 31 U.S.C. § 3730(h), Mosley is entitled to damages including two times the amount of back pay, interest on back pay, and any other damages available by law, including litigation costs and reasonable attorneys' fees.

## PRAYER FOR RELIEF

160.    Wherefore, the Relators Rhodes and Mosley, acting on behalf of and in the name of the United States of America and on their own behalf, pray that judgment be entered against Defendants for violations of the federal False Claims Act as follows:

    a.    In favor of the United States against Defendants for treble damages to the U.S. Government and the maximum civil penalties for each violation of the federal False Claims Act;

    b.    In favor of the Relators for the maximum amount pursuant to 31 U.S.C. §§ 3730(d) & 3730(h), as well as reasonable expenses, attorney fees, and costs incurred by the Relators and their counsel;

    c.    For all costs of the federal False Claims Act civil action; and

    d.    In favor of the Relators and the United States for further relief as this court deems just and equitable.

## DEMAND FOR A JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure and pursuant to the local rules of this Court, the Relators demand a jury trial as to all issues so triable.

Respectfully submitted,
THE EMPLOYMENT LAW GROUP, P.C.

By: _____

David L. Scher, Esq.
*Pro Hac Vice* to be filed
R. Scott Oswald, Esq.
The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
(202) 261-2802
(202) 261-2835 (facsimile)
dscher@employmentlawgroup.com
soswald@employmentlawgroup.com
*Counsel for the Relators*

Dated: March 1, 2017